UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

             Plaintiff,

       v.

JASON B. MATSON,

             Defendant.

No. CR-07-141-FVS

FINDINGS, CONCLUSIONS,
AND ORDER

**THIS MATTER** came before the Court for an evidentiary hearing based upon Jason Matson's motion to suppress evidence. The hearing occurred on May 2, 2008, June 3, 2008, and June 20, 2008. Mr. Matson was represented by Robert R. Fischer and Kailey E. Moran. The government was represented by Jared C. Kimball.

**SUMMARY**

At about 9:50 p.m. on October 2, 2007, agents of the United States Border Patrol observed Jason Matson drive into the parking lot of a store that had closed for the night. The store is located approximately 300 yards south of the border between the United States and Canada. During the 20 minutes preceding Mr. Matson's arrival, electronic sensors were triggered in the area between the border and the store. The sequence in which the sensors were triggered indicated to the agents that at least one person had crossed the border and was approaching the store by means of a trail. Mr. Matson saw the Border

FINDINGS, CONCLUSIONS, AND ORDER - 1

Patrol agents, made a call from a pay phone, and drove back in the direction from which he had come.  As he drove south on State Route 21, followed by Agent Jay Engebretson, the sensors between the store and the border were again triggered.  The sequence indicated that a person was walking back toward Canada.  Agent Engebretson followed Mr. Matson for approximately five miles.  When he reached the place where Agent John Porter was parked, Agent Engebretson pulled Mr. Matson over.  The information that the agents learned during the course of the stop deepened their suspicions.  Agent Porter radioed a Border Patrol dispatcher and asked the dispatcher to contact Agent Daniel McElheran, who has a dog that is trained to detect controlled substances.  Agent McElheran was at home.  He arrived with his dog at the scene of the stop approximately 10 to 15 minutes after receiving the call.  He had the dog sniff Mr. Matson's car.  The dog reacted in a manner that indicated the presence of a controlled substance.  Border Patrol agents searched the car without a warrant.  Mr. Matson moves to suppress the evidence that they obtained.  He argues that the initial stop violated the Fourth Amendment, and that, even if it did not, it was unreasonable for the agents to detain him pending Agent McElheran's arrival.  Finally, he argues that the dog's reaction was not a valid indication that the car contained a controlled substance.

**FINDINGS OF FACT**

1. The village of Danville, Washington, is located just south of the border between the United States and Canada.

2. The area is geographically remote and rugged.  It is sparsely populated on the American side of the border.

FINDINGS, CONCLUSIONS, AND ORDER - 2

3. There is a Port of Entry at Danville.  It closes at midnight.

4. The Danville Market is located in the State of Washington approximately 300 yards south of the border.

5. Smugglers frequently cross the border near the store.  So serious is the problem that the Border Patrol has placed electronic sensors in the area.

6. On or about October 1, 2007, Border Patrol agents found Ritalin and Ecstasy pills along a trail on the hillside behind the store.  The type and location of the pills indicated that they had been smuggled.

7. Agents expected smuggling during the night of October 2nd.

8. That evening, Agent John Porter parked approximately five miles south of Danville at the intersection of State Route 21 and Big Goosmus Road.

9. Another agent hid along the east side of the Kettle River, using his binoculars to watch the area around the store.

10. Agents Jay Engebretson, Scott Harper, and Domonic Lofland drove in separate vehicles to the parking lot of the store.  They began formulating a plan to intercept smugglers that night.  The store was closed.

11. Shortly after 9:30 p.m., a Border Patrol dispatcher began informing the agents that electronic monitoring devices were being triggered near the store.

12. Sensors were triggered at 9:33 p.m., 9:39 p.m., 9:47 p.m., and 9:49 p.m.

13. The fact that the sensors were being triggered in this order

FINDINGS, CONCLUSIONS, AND ORDER - 3

indicated that at least one person had entered the United States from Canada and was walking along a trail on the hillside behind the store.

14. At about 9:50 p.m., a Chevy Cobalt pulled into the store's parking lot and stopped near the gas pumps.

15. It is unlikely that the driver saw the agents' vehicles until he pulled into the parking lot.

16. The driver waited in the car for a minute or two and then walked to a pay phone and made a call.  The call occurred at 9:52 p.m. and lasted less than one minute.

17. An agent radioed the car's license number to a dispatcher, who said it was a rental vehicle.

18. The agents knew that smugglers often use rental cars instead of personal vehicles in order to conceal their identities and avoid forfeiture of personal vehicles in the event of arrest.

19. The driver got back into the Chevy Cobalt and pulled onto the highway.

20. Instead of driving north to the border, he drove south (*i.e.*, the direction from which he had come).  Agent Engebretson followed him.

21. After the rental car drove south, electronic sensors were again triggered; this time, in a manner indicating that at least one person was walking north toward the border.

22. When the Chevy Cobalt reached Big Goosmus Road, which is where Agent Porter was parked, Agent Engebretson pulled the car over.

23. The stop began at approximately 10:00 p.m.

24. The driver was the sole occupant.  He was smoking a

FINDINGS, CONCLUSIONS, AND ORDER - 4

cigarette.

25. Agent Engebretson asked him to state his citizenship. The driver said he is an American.

26. Agent Engebretson asked what he was doing in the area. He said he was looking for the Town of Republic.

27. Agent Engebretson asked for identification. He produced a driver's license that identified him as Jason B. Matson.

28. Mr. Matson was taking repeated drags from his cigarette. His hands shook as he handed his license to Agent Engebretson.

29. Agent Engebretson asked a Border Patrol dispatcher to run a records check.

30. The dispatcher advised Agent Engebretson that there were no warrants for Mr. Matson's arrest, but that "his criminal history was positive for a 1046."

31. The number 1046 indicates a narcotics conviction. It can be either a misdemeanor or a felony conviction.

32. Agent Engebretson returned to the rental car and again asked Mr. Matson where he was going. He said he was looking for a friend's house in Republic. This seemed odd to Agent Engebretson. One would not expect a person who had driven north in search of Republic to be at the border. In addition, Mr. Matson's body language and manner of speaking suggested to Agent Engebretson that he was unusually anxious.

33. Agent Engebretson walked back to where Agent Porter was standing and discussed the situation with him.

34. Agent Porter asked a dispatcher to contact Agent Daniel McElheran, who has a dog that is trained to detect controlled

FINDINGS, CONCLUSIONS, AND ORDER - 5

substances.  Agent Porter asked the dispatcher to have Agent McElheran bring his dog to the place where Mr. Matson was detained.

35. Agent Engebretson handcuffed Mr. Matson and placed him in the back of another law enforcement officer's patrol car.

36. Agent McElheran was at home.  He received the call between 10:00 and 10:15 p.m.  It took him approximately 10-15 minutes to drive to the place where Mr. Matson was being detained.

37. Based upon the training that Agent McElheran's dog has received, and based upon the dog's performance during training and in the field, the dog is a reliable detector of controlled substances.

38. Agent McElheran had his dog sniff the rental car.  The dog reacted in a manner indicating the presence of a controlled substance in the trunk of the car.

39. The dog's reaction was a valid indication that a controlled substance was present.

**INVESTIGATORY STOP**

The Fourth Amendment guarantees the right of the people to be free from unreasonable seizures.  *See, e.g., Whren v. United States*, 517 U.S. 806, 809, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). Fourth Amendment seizures may be divided into two categories, *viz.*, investigatory stops and arrests.  An investigatory stop is justified "'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot . . . .'"  *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (quoting  Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968)).  In such

circumstances, "the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." *Id.* An investigatory stop must be supported by reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). Whether reasonable suspicion exists depends upon "the totality of the circumstances surrounding the stop." *United States v. Hall*, 974 F.2d 1201, 1204 (9th Cir.1992). "This includes the 'collective knowledge of the officers involved, and the inferences reached by experienced, trained officers.'" *Id.* (quoting *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985)). This case differs from many cases involving investigatory stops in that the stop was effected by a Border Patrol agent near the Canadian border. Given this circumstance, the Court must consider the following factors when analyzing the reasonableness of the agents' actions:

> (1) characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver, including 'obvious attempts to evade officers'; (6) appearance or behavior of passengers; (7) model and appearance of the vehicle; and, (8) officer experience.

*United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir.2007).[1]

Mr. Matson argues that a careful analysis of the preceding factors reveals that the agents lacked a reasonable basis for suspecting he was involved in criminal activity. It is not the

---

[1]The factors are drawn from *United States v. Brignoni-Ponce*, 422 U.S. 873, 884-5, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975).

FINDINGS, CONCLUSIONS, AND ORDER - 7

sparsely populated area described by the government, he says.  If one includes those who live on the Canadian side of the border, a significant number of people live in the Danville area.  The Danville Market is not far from the Port of Entry, which remains open until midnight.  In Mr. Matson's opinion, there is nothing unusual about a motorist pulling into the parking lot of a store and using a pay phone to make a call; especially where, as in the Danville area, there is uneven cell phone coverage.  Nor, according to Mr. Matson, is there anything unusual about the fact that he was driving a rental car. Many travelers do.  Furthermore, travelers make wrong turns.  A person driving from Spokane, Washington, to Republic could make a wrong turn, miss a sign or two, and end up in Danville.  Mr. Matson acknowledges that the electronic sensors went off, but he points out that they are merely mechanical devices and that the agents never did observe anyone that night on the hillside above the store.  As Mr. Matson sees it, little or nothing may be inferred from the fact that he pulled into the parking lot of the store in a rental car and made a call from a pay phone.  Finally, he argues that the agents' suspicions should have been dispelled by his behavior during the stop.  He promptly pulled over and produced a valid vehicle registration and driver's license.

The government views the evidence much differently.  According to the government, the American side of the border is sparsely populated. The Danville Market is the only business on this side and it was closed when the defendant arrived.  The government submits that, at 10:00 p.m., there is little or no traffic on Highway 21 near the store despite the fact that the Port of Entry is open until midnight.

FINDINGS, CONCLUSIONS, AND ORDER - 8

However, smuggling is common.  A day or two before this incident,
Border Patrol agents found a number of Ritalin and Ecstasy pills lying
on a trail near the store.  Indeed, just before Mr. Matson arrived,
electronic sensors went off in the area between the border and the
store.  The sequence in which the sensors were triggered suggested
that a person was walking toward the store.  At about the same time,
Mr. Matson arrived in a rental car; a type of car which drug
traffickers often use.  He saw the agents, made a brief phone call,
and left.  Instead of driving north to the Port of Entry, which is
what one would have expected, he returned in the direction from which
he had come.  As he drove south, the sensors were again triggered.
This time, the sequence indicated that a person was walking back
toward the border.

   After considering the record as a whole, the Court is satisfied
that the agents had a reasonable basis for suspecting that Mr. Matson
was involved in smuggling.  While he posits innocent explanations for
each of his behaviors, the existence of potentially innocent
explanations is not dispositive.  Taken together, individual instances
of innocent conduct may amount to reasonable suspicion.  *Sokolow*, 490
U.S. at 9-10, 109 S.Ct. at 1586-87.  That principle applies with
particular force here.  An objective law enforcement officer in the
agents' position reasonably would have suspected Mr. Matson of
smuggling.  Viewed in its entirety, the information available to the
agents strongly suggested that someone had illegally crossed the
border in order to meet Mr. Matson at the Danville Market at about
10:00 p.m.  Mr. Matson saw the agents and aborted the meeting.  After

FINDINGS, CONCLUSIONS, AND ORDER - 9

doing so, he headed back in the direction from which he had come.
Agent Engebretson properly stopped and questioned him.

### LENGTH OF INVESTIGATORY STOP

When a law enforcement officer makes an investigatory stop, he
may not prolong questioning beyond the amount of time reasonably
necessary to resolve the suspicion that gave rise to the stop.
*Muehler v. Mena*, 544 U.S. 93, 101, 125 S.Ct. 1465, 1471, 161 L.Ed.2d
299 (2005).  Whether an officer has unconstitutionally prolonged a
stop depends upon the reasonableness of his actions when viewed in
light of the totality of the circumstances.  *See United States v.
Turvin*, 517 F.3d 1097, 1101 (9th Cir.2008).  Here, the agents' initial
suspicions were not promptly resolved at the outset of the stop.  To
the contrary, they were reinforced by Mr. Matson's nervous behavior,
his suspicious explanation of his presence in Danville, and his
criminal history.  Given all of the information which was available to
Agents Porter and Engebretson at that point, it was reasonable for
them to request the assistance of Agent McElheran and his dog.  Not
only that, but also it was reasonable for Agent Engebretson to detain
Mr. Matson while he waited for Agent McElheran.  Mr. Matson had a
criminal conviction.  The stop occurred at night alongside a highway
in a remote, rugged area.  His behavior during the course of the stop
suggested that he was agitated.  Had he fled on foot, it would have
been difficult, if not impossible, for the agents to overtake and
apprehend him.  Thus, handcuffing him and placing him in the back of a
patrol car were reasonable precautions.  He did not have to wait long
in the patrol car.  Agent McElheran and his dog arrived within 10 or

FINDINGS, CONCLUSIONS, AND ORDER - 10

15 minutes.  At that point, less than 35 minutes had elapsed since the stop began.  While that is a significant period of time in the context of an investigatory stop, it was not an unreasonable period of time in light of the totality of the circumstances.

**DOG SNIFF**

Having the dog sniff the car was not a search within the meaning of the Fourth Amendment.  *Illinois v. Caballes*, 543 U.S. 405, 408-10, 125 S.Ct. 834, 837-38, 160 L.Ed.2d 842 (2005).  The dog was well trained and had performed competently during training and in the field.  Agent McElheran knew how to interpret the dog's behavior.  Consequently, the manner in which the dog reacted when near the trunk of the car established probable cause to believe that the trunk contained a controlled substance.  *See United States v. Cedano-Arellano*, 332 F.3d 568, 573 (9th Cir.2003).  Once the agents had probable cause to believe that Mr. Matson's car contained a controlled substance, they were entitled to conduct a warrantless search "of every part of the vehicle and its contents . . . that [might have] conceal[ed] the object of the search."  *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 2173, 72 L.Ed.2d 572 (1982).

**IT IS HEREBY ORDERED:**

The defendant's motion to suppress (**Ct. Rec. 35**) is denied.

**IT IS SO ORDERED.**  The District Court Executive is hereby directed to enter this order and furnish copies to counsel.

**DATED** this ___3rd___ day of October, 2008.

            ___s/ Fred Van Sickle___
                Fred Van Sickle
       Senior United States District Judge

FINDINGS, CONCLUSIONS, AND ORDER - 11